Good morning, Your Honors. My name is Torger Owens. I'm an attorney from Lewistown, Montana. And I'm here with Coal Counsel Bill Berger on behalf of the plaintiff and the appellant Fred Groves. Between myself and Mr. Berger, we divided up the time. I'm prepared to address all of the issues except punitive damages. The punitive damage issue, Mr. Berger is going to address that issue. We have a clock there. Yes. Whenever you leave on the clock. And we're going to reserve a little time for you. Thank you, Your Honor. Whenever he leaves, you can have a little. Okay. Yeah, we understand that. Ever since 1975 in Montana when we adopted our comparative negligence scheme, I think all plaintiff's lawyers, including myself, believed that Montana just had a simple, ordinary, hum-drum, run-of-the-mill comparative negligence scheme. And we certainly felt that it would never allow the comparison of intentional versus negligent conduct in an ordinary negligence case. That belief was reinforced by Derenberger v. Loody when the Supreme Court went a little bit over to the plaintiff's side and held for a time that even gross negligence and ordinary negligence couldn't be compared to reduce the damages of a plaintiff in such a situation. Derenberger was overruled in Martel, but Martel has been the standard in Montana ever since when it held that in a negligence case, all forms of negligence could be compared, whether it was gross negligence or ordinary negligence or whatever kind of term you wanted to put on it, that conduct could be compared between the parties in the case, except and until it rose to the level of intentional conduct. Martel has been the law in Montana. Yes, Your Honor, that's the comparative negligence statute. It only addresses negligence. It's the ultimate issue in this case whether Montana is a comparative negligence state or are we a comparative fault state where you can lump all kinds of conduct in and have the jury sort it out, irrespective of to the degree of fault. In Montana, 27.1702 only speaks to negligence, and 27.1703, the statute, which is entitled Multiple Fenomens Determinants of Liability, again, only speaks in terms of negligence. We don't have a definition of the word negligence in the statute like some states do. For instance, North Dakota, where there's a case that holds that negligence or fault includes all kind of conduct, including intentional. The only time the word fault appears in 27.1703 is in subsection 6C, which is not applicable to this case, where it just says except for persons who have settled with or have been released by the claimant, comparison of fault with any of the falling persons is prohibited. I don't know why the legislature used the fault in that particular situation, but I know that the defendant in the appellee places a lot of emphasis on that point. But certainly an overall reading of the statute makes it clear that the Montana legislature intended 27.1702 and 27.1703 to not include intentional conduct to be compared with negligence when the plaintiff sues in negligence. I guess the question I had is the case following that PULA? PULA. PULA. So the question, let me ask the question first and you can answer it. The difficulty I had with PULA is it says it isn't a scheme to apportion blame. So in other words, it seems to suggest that it's not just a comparative fault state. But then it takes rape as an act of intervening negligence. So I had some trouble reconciling why rape, which appears to me to be more of an intentional than a negligent act, would be different than the bus passenger situation. Right. I think PULA is simply an ordinary application of the doctrine of intervening superseding cause. And I certainly plaintiff has no objection in the bus case with the jury's consideration of Fagnani's conduct, the drunk who started the fight, as an intervening superseding cause. I think that issue is going to rise in any case where you're trying to, where you're suing for negligence against a defendant who's supposed to control the conduct of a third party. That issue is always going to rise. We objected to the consideration of Fagnani's conduct on the issue of apportionment of fault. And in PULA, it's simply in PULA, and I know that the appellee relies heavily on PULA, because PULA is just an ordinary application of the intervening superseding cause doctrine. In PULA, you know, the plaintiff sued the state of Montana for negligence because it allowed a serial rapist to eventually become a trustee at a county jail. And the rapist, Bauer, raped a young woman who had been in there on a minor traffic offense. And the jury was instructed on the ordinary principles of negligence and given the intervening superseding cause instruction and simply answered the second question in the negative that the state of Montana's conduct was not the cause of the plaintiff's injuries. So I don't have any argument with PULA or what it stands for. It's simply not applicable in this case. So you're separating causation from liability? Yes. Well, I'm separating the doctrine of superseding cause, intervening superseding cause, from apportionment of fault, apportionment of negligence. It certainly wouldn't have been appropriate in this case where we had the fagnani, the drunk terrorizing the bus for two, two and a half hours before this assault occurred. Certainly, the jury should have been considered whether or not his conduct was foreseeable on the issue of intervening superseding cause. We knew that from the get-go. Now it's always going to come up in these kind of cases. We believe that the evidence clearly held it was foreseeable. The jury held that his conduct was not intervening superseding cause. And after the jury answered no on the verdict form that his conduct was not an intervening superseding cause, that should have been it as far as the jury's consideration of fagnani's conduct for anything else. Let me just make clear. 702 doesn't apply at all here, does it? No. Because the jury didn't find Mr. Groves negligent at all. No. In 702, it was only dealing with imperative negligence. Right. All right. Yeah. So the jury found that goes to the 10 percent, the disappearing 10 percent argument. I mean, the jury found that's another issue. The jury found that Groves wasn't negligent, found that he acted intentionally in causing injuries, but his intentional conduct was excused because it was justifiable self-defense, found that his conduct was not an intervening superseding cause. So after answering all of those questions in Groves' favor, they sort of went off the shift and assigned him 10 percent at fault. And the court at that point in time had an irreconcilable verdict and should have refused the inner judgment and should have granted a new trial at that time because there was simply no way without engaging in wild speculation where that 10 percent would go. Is that what you're asking for, a new trial? Yes. Yes, we're asking for a new trial because I think that the rule of law is in the Montana cases and the Wills case is that once you have an inconsistent verdict, even though you're not attacking the amount of damages per se, the only way to remedy the inconsistency is to grant a new trial. And the Wills case stands for the proposition that the court isn't even supposed to enter a judgment when it finds such an inconsistency. And I don't want to sit down without pointing out that we have in Montana, I'm sure the court has noticed that we have a sort of a tension between the legislature and the Montana Supreme Court. I mean, we have like 702 and then we have the alternate 702. That means that if the 702 was somehow found non-constitutional, the legislature is foisted upon us, especially from the plaintiff's point of view, a statute that is harsher on the plaintiffs. They did that in 27.1703 with our multiple defendants determination of liability, and then they enacted 27.1703. That's to go into effect if 703 was held unconstitutional. If you look at 705, it is a pure comparative fault scheme. So obviously the legislature was aware of the difference. And I think to me that is the clearest signal from the Montana legislature. They're saying, hey, we know what the difference between a comparative negligence statutory scheme is, and we know what the difference between a comparative fault scheme is, and we're going to give you, for now, at least a comparative negligence scheme, and as long as you don't mess with it, Supreme Court, you don't have to get the worst situation. So I don't see how that can be argued against. But I'm going to sit down and let my counterpart address the punitive damage. Honorable Judges of the Nyser Circuit Court of Appeals, I am prepared to speak to Judge Haddon's number one ruling on and two, that there was insufficient evidence to submit punitive damages to the jury. May I just ask a question? Yes. Was there any evidence introduced to show that Greyhound knew his procedures for dealing with drunken passengers were inadequate? Was there anything introduced in the record showing past events that indicated that Greyhound should have known that his procedures were inadequate? The evidence that was introduced was the driver's manual, the teaching manual that the drivers all go through when they first go to school to become a bus driver, and in both of those instances, in the driver's manual and the teacher's manual, it is set forth that drunk and unruly passengers pose a danger to the passenger. I would submit they pose a danger to the bus driver. And at that point, they were instructed to put the passenger off, I think it says, at the closest lit stop. The bus driver tried to do that and was unsuccessful. Isn't that true? Well, in this particular case, the bus driver at one point did have Mr. Fagnani, who was the unruly passenger, off of the bus. However, she could have left him there. She didn't have to have the police come and get him. She could have just left him there. But she said she didn't know what to do, and I think that is evident throughout the bus trip. She just didn't know how to deal with this guy. And even more so, because she didn't know how to deal with this guy, she was unable to communicate when he really got unruly and was threatening the little girl, and the passengers were saying, we're all going to die. And at that point... Those are factual issues, but do they really go to the issue of whether these procedures were in some way insufficient? The procedures were laid out there, but every situation is going to be a little different. What is it that suggests some kind of deliberate indifference by Greyhound? Well, I think the deliberate indifference is not to allow her to have any ability to communicate with the outside world when this bus is careening down the interstate with a drunk passenger, and she had only one thing she could have done. She could have tried to stop the bus in the middle of the night and kick the guy off. I think it's a matter of... Let's say she didn't have a means of communicating. What would you have done then? She could have called the highway patrol and had them stop her on the road. She could have had at the next stop a highway patrol or a sheriff. She already had a contact with the police, didn't she? Excuse me, Your Honor? She tried to drop him off. She tried to drop him off. Well, she had him off the bus, but let him back on. The police weren't interested. But I don't think that just because the police aren't interested, she couldn't have left him off the bus at that time. She didn't know what to do. But you were asking my question as to what she would have done if she had made the call. She's already done the call on the bus. She's already talked to the police. The police are not interested. Now she's back in the bus, and she now has a way of communicating. Does she call him back again and say... Well, she could have called the highway patrol or another police officer for one thing, but... Or she could have shopped, gone to a different county and... So, driven to a different county and tried the next police department. Well, I think she could have left him off the bus at the time, but in her training, she didn't know what to do. She should have left him off the bus when she had him off. She didn't have to let him back on the bus. But as she said in her testimony... That might be bad judgment. But does it rise to the level of evidence that would net a punitive damages award? I mean, that's really the question. Maybe she made a bad call.  I agree. I agree, Your Honor. If she made a bad call as punitive damages, then punitive damages wouldn't mean anything different than ordinary damages. Well, in this particular case, Greyhound knew that drunks were a real problem. And they did not train her on how to deal with those drunks. I mean, their trainer's manual and their driver's manual really is devoid of what this lady is supposed to do. And on top of that, they don't provide her with any means of communicating to anybody to come and help her. I think the Onstead case in Montana, Onstead v. Payless, really would be totally on all fours of this case. If in the Onstead, if in the bus case, the injured party would have been the bus driver. I mean, really, I see that to be the only difference. It's a matter of notification. The Onstead case says that you didn't, you, Payless, didn't provide any means of notification when this accoster came forth and accosted the employee of Payless. Well, if Mr. Fagnani would have accosted the driver, and she had no means of notification of anybody, knowing that something like that might happen or something that was going to happen, I think it's about the same thing. Was there any evidence introduced of any past incidents where the jury would have a basis to conclude that Greyhound knew what should have had a communication system? The only evidence that was introduced as far as the communication system was is that the bus driver herself said that Greyhound's policy is that we do not provide any onboard communications, but you could have your own cell phone if you wanted. So there's nothing to indicate that if there had been a communication system aboard, that everyone would have been safe, based on past incidents? Well, I think that's pretty, not based on past incidents, Your Honor, but I think that's pretty well ordinary common knowledge, that if you're able to call somebody and get some help, that your situation isn't going to be as dire, and the injury can be avoided. Everybody has a cell phone anymore. I had a friend of mine that went to Tibet, and one of the things when they came back, they said, well, they didn't have running water, they didn't have any central heat, but one thing they all had was cell phones. Well, who was she going to call besides the police? High Patrol, Sheriff, 911. Thank you. We'd like to reserve three minutes and 20 seconds for questions. Three minutes and 19 seconds. Good morning. Michael Rapkoch, representing Greyhound Lines, and may it please the Court. Greyhound Lines takes the position that the district court's primary error in this case was in the failure to grant Greyhound's Rule 50 motion at the close of the plaintiff's case, regarding the entirety of the negligence claim brought against Greyhound Lines. The basis for Greyhound Lines' Rule 50 motion was that under Montana law, and particularly given the circumstances of this case, it is the responsibility of the district court to determine whether or not the plaintiff has established a duty in the defendant, a duty which is cognizable under Montana law. Specifically, in determining whether or not there is a duty, Montana has undergone a reexamination of its tort law and has, in a decision entitled Busta v. Columbus Hospital, reestablished the general analysis of the famous Paul's Wrath case in determining the nature of a duty. And what the court has declared is that a duty is established when the plaintiff is able to show that it is reasonably foreseeable that a particular event will occur such that the defendant has put on notice of the need to do something about that event in advance. It is the obligation of the court in its gatekeeping function to make that determination. Indeed, in Busta, the Supreme Court recommended very strongly against submitting questions concerning foreseeability to the jury and specifically stated the jury should not generally be instructed on the question of foreseeability. It is, therefore, ultimately a question of law for the court to decide, and the court erred in deciding to let this matter proceed to the jury. The facts of this case establish the error clearly and unambiguously. And the facts of this case are that there was no conceivable way of predicting the response of Fred Groves to what happened in Dickinson, North Dakota. The district court recognized this as a problem, and the district court expressed concern, but nonetheless allowed the matter to go to the jury in a manner inconsistent with the law of Montana. Well, let me say, in your briefs you argue that they did not intend to injure Groves' knee. That surprised me because I don't have no case, and maybe you can tell me one, that says it has to be foreseeable that he would injure the knee. Your Honor, I believe you're correct. And, in fact, I believe the Montana Supreme Court has clarified that in the decision entitled Samson that came out a short time ago. You don't have to be able to foresee the injury, but that really isn't the point. You have to be able to foresee the conduct that would lead to the injury, and that conduct is the conduct of Fred Groves in his reaction to the slap. And remember that the evidence in this case established through Ms. Houston was that Mr. Fagnani merely slapped Mr. Groves. The determination has to be that it was possible for the bus driver to foresee that Mr. Groves would, and again, in the words of Ms. Houston, flip out, not only cold cock Mr. Fagnani, knocking him against the windshield of the bus, cracking it so that he slumped to the floor, but then jumping on top of him and hitting him several more times, and in the process of doing that, injuring his knee. Wasn't there a question for the fact that the disputed issue as to whether or not Mr. Fagnani was subdued before Mr. Groves jumped on him after he smacked him? Your Honor, if you look carefully at Mr. Groves' testimony, I believe the answer to that question is no. With all due respect to the Court's rule on reading at length from the record, I do have just a brief reference from the record that I would like to point out to the Court. Specifically, it is in the trial transcript at pages 672 to 673, and you can find it in defendant's appendix, excerpts of record, on page 180. The question asked of Mr. Groves by his own attorney was, did you hit Mr. Fagnani back? His answer was, yes, I did. The question was, just as you showed there, and he answered, yes. Then what happened, and Mr. Fagnani responded, I remember his falling backwards. His head hit the passenger side windshield. It cracked, and then he slid down to the floor, and then the next thing I remember, I was hitting him on the head a few more times. In other words, what Mr. Groves' testimony, without any additional gloss by his attorney established, was that his actions in jumping on top of Mr. Fagnani were utterly unconscious. Didn't he also testify that he was concerned because there were other passengers on the bus, and he was concerned that Fagnani may pose a threat, that he might have a knife or a gun? But if you continue to read in that passage of the testimony, and you put it all together, isn't that what he says? Your Honor, that certainly is the story that the plaintiff attempted to tell at trial. However, when you look at the, as it were, bare reading of what Mr. Groves did, his reaction had nothing to do with threats of guns nor concern about other passengers. His reaction was to coca Mr. Fagnani, crack the windshield with his head, and then, as he said, the next thing he knew, he's on top of Mr. Fagnani. There was no consideration by his own testimony of any of these other factors, and given that unconscious and clearly excessive response to what had happened here, he had merely been slapped. I'm sorry. I don't understand what you're saying. What I'm suggesting, Your Honor, is... You say it's unconscious, and I mean, where do you get that? Again, from Mr. Groves' testimony. The next thing I knew, I was on top of him. When one gets involved in an altercation where those are being struck back and forth, obviously, first of all, we have to get them on something dangerous, and I don't quite understand your point. Your Honor, my... If they're supposed to sit there, cogitate, you know, gee, hitting him one more time makes a difference, presumably you would subdue the person so that the danger that the person poses doesn't continue. Your Honor, the issue is not, and we have not appealed the jury's determination of whether or not Mr. Groves' conduct was, quote-unquote, justifiable use of force. That's why I'm still wondering what your point is. The question is one of foreseeability and therefore of damages. In other words, could Greyhound, through its bus driver, realistically have expected that Mr. Groves, without thinking and having, by his own testimony, knocked Mr. Fagnani down to the ground, would jump on top of him and in the process injure his own knee? Your point is something totally ridiculous. I don't know. Well, Your Honor... You know, they have to predict every move in an altercation. The greatest case, and you know, you can dispute it or not, is that, look, there's a drunk on the bus. The bus driver was not trained to deal with that situation. The bus driver didn't have equipment to call for help. And what happens is when you put a drunk in the midst of a group of peaceful people, you can get a dangerous situation. You can get a situation where violence erupts and things can move very quickly. I don't think they have to predict that the guy is going to hit him six times as opposed to five times or three times as opposed to two times. Once violence erupts, I think most people would expect that it would continue until one of the parties subdued, hopefully the initial aggressor. Now, not that you would sit there and say, okay, buddy, you've had enough, or do I have to injure you again? I don't think that's how things play out in real life. I don't think that Greyhound can be expected... I mean, say, you don't think you're expected to get this drunk on that bus. The point is this was a dangerous situation. According to plaintiffs, and you can dispute this if you want, your client helped bring it about by failing to train the bus driver to deal with it and failing to give her the means to call for help. I think this is a thin slice of the salami. It didn't work with the jury. It's not going to work with us. Well, Your Honor, I do dispute the lack of training, and I do dispute the issues concerning onboard communication. I will, Your Honor. Try to. I don't get it. Well, as I say, the question of foreseeability was for the court in terms of Montana law, and the court had to ask of Greyhound that it see all the way down the road. I'm sorry. This was submitted to the jury, right? It was, Your Honor. Okay, let me... However... Over objection. Over objection. However... Over Greyhound's objection. Correct. And your position is that foreseeability may not be submitted to the jury. Foreseeability, given the case law in Montana, given the circumstances of this case were such that the court could and properly would have ruled that ultimately what happened with Mr. Groves... It may be that you're right that the court had decided to take foreseeability from the jury. Maybe we would sustain that, but it didn't. You must persuade us that it erred in submitting it to the jury, and the law in Montana would be very strange indeed if it precluded a judge from submitting foreseeability to a jury. Is it quite that strange? Is BUSTA that strong a precedent? I didn't read it as being that strong, but I am here to be educated. You show me where in BUSTA it says that. Well, Your Honor, I would refer it to the court. Where one can do a... BUSTA is your precedent, is it right? Or BUSTA or BUSTA? It's BUSTA as I understand it, Your Honor, and I would refer it to the court. It's BUSTA and PULA, right? Yes. Not BUSTA and POWER. Well, I'm assuming. I wasn't involved in either case, so I'm just guessing. Exactly. Okay, but we're talking about the same case, and I have it in front of me, and I am anxious to be educated by you. Well, Your Honor... What is it that says a trial court errs when it submits foreseeability to a jury? Even though you say it in so many words, what is the language on which you rely for that inference? I'm looking, Your Honor, at the Montana version, the Montana reporter version of the case. You just tell me where it is. We further, if I may, Your Honor, quoting from the case, we further recommend the terms such as proximate cause, illegal cause, and reasonable... Excuse me. I didn't mean you could just start reading. I'm sorry. You have to sort of tell me where you are. I can't guess that. I'm attempting. I'm sorry, Your Honor. So tell me, you know, sort of page number or a paragraph number. I have one. It's in the discussion section about halfway down. Give me a hint. I have 140, I should say. 140, did you say? Page 140 of the Montana reporter. Okay, I have a problem finding page 140. I am with you. Excuse me. Okay, I am with you. Okay, page 140, that's easy. Making reference to the first column. Is the paragraph that starts in those cases? No, Your Honor, it is the paragraph that the Court may be right. Let me look back at the paragraph. Yes, it is, Your Honor. Okay. We're together. Go. The Court stated, we further recommend the terms such as proximate cause, illegal cause, and reasonable foreseeability, which have some significance to lawyers and judges, not be allowed to confuse jurors by the inclusion of those terms in jury instructions. The Court. Well, but that is a different proposition than saying you don't submit the issue to the jury. I thought, maybe I'm wrong, but I thought what they were saying is don't use confusing lawyers' jargon, like proximate cause, because who knows what proximate cause is? Well, but it does say foreseeability, and the question of foreseeability was submitted to the jury. And from my reading of Boosden, as well as the state of Striever v. Klein, this is ultimately a legal question. To the extent the foreseeability raises a jury issue, it is adequately addressed by the definition of negligence, including Montana Federal Instruction 200. I see that language, Your Honor, but in this particular case, the specific issue of foreseeability, and that language was submitted to the jury, and it's the position of Greyhound, that that was error given the circumstances of the case. Did you object to the special verdict form? Your Honor, we did not. And the special verdict form uses the phrase, not reasonably foreseeable, does it not? It does. Turning my attention then to the issues raised by the plaintiff, and with specific reference to the issue of comparison of intentional conduct and negligent conduct. In the first place, I believe that Judge Kaczynski is right in saying that the statutes relied upon by the plaintiff in arguing that only, quote-unquote, negligent conduct can be compared do not specifically say that. And in fact, the statute that creates obligations and upon which we preface causes of action in the state of Montana is Section 27-1-701, which specifically holds parties liable for both their intentional and negligent conduct. Furthermore, the distribution or attribution of false statutes, Section 27-1-703, contains no specific prohibition on the consideration of an intentional conduct and does, in fact, contain a reference to the term false. Okay, let me step back. What is the relationship of 701, which basically just says porn book law, which is you can get nailed for either intentional or negligent acts. That is not necessarily to be read as a statement of how you abortion comparative fault, is it? I mean, that basically just says you can get liability for one or the other in Montana. The court is correct. However, the examination of whether or not the types of conduct at issue here can be compared is ultimately determined not specifically by reference to the statutes, but by the Supreme Court's decision in Pula, and let me explain Pula in greater detail than was explained by counsel for the appellants. I'm sorry. You're jumping around. You started off by telling us the statutes support your case, and then just recue and ask you about 701, which doesn't seem to do that at all. All it says is you're liable for either negligence or intentional. If you agree with that, he said, but... Well, now let's go to 702. It basically says that as long as your contributory negligence isn't greater than the other person, then you can recover under 702, correct? Yes, Your Honor. Okay. And then 703 then just talks about negligence also, correct? Attribution of liability between negligent parties is... Well, 703 is the one that you rely on, right? 703-1. Yes, Your Honor. It says if the negligence of any party to an action is an issue, each party against whom recovery may be allowed is jointly and separately liable. The first phrase deals with negligence. The second phrase deals with all people who are liable. I thought that was your argument. It is partly, Your Honor. However, that language does not specifically exclude the consideration of intentional conduct and, in fact, our argument is by implication allows that consideration. How? Because when it says if the issue of negligence is at issue, it does not declare that only that issue can be considered by the finder of fact. Further in the statute, it does discuss the question of joining parties whose conduct may constitute fault and under what circumstances you may do so. And then where do you get the notion that it's a comparative fault state? Because joint and separate liability is joint and separate liability. Well, Your Honor, ultimately, the issue of comparative fault has to be analyzed, again, under the Pula decision and from the perspective... I'm trying to understand from the statutes because if you look at the statutory scheme around the country, you have comparative fault states, you have those that relate solely to negligence, and there seems to be a pretty clear dividing line if you read the statutes. I'm reading the Montana statute, and I'm not seeing anything there that would suggest that Montana is a comparative fault state. Your Honor, with all due respect, I think it is the absence of a discussion, a specific prohibition on the comparison of fault that is most relevant here. And again, in the limited time I have... Let me just... Well, I don't understand. So you're saying that because Montana doesn't explicitly prohibit it, it therefore must permit comparative fault? I'm asking the Court to consider the entirety of Montana law, and specifically the general requirement, Hornbook law, that in any court case the elements of duty, breach, causation, and damages have to be established, and the focus of Pula is on the issue of causation. And let me argue... But then it also said in Pula that one of the things the Court was not doing was, quote, how to apportion blame among several liable parties. What do you think the Court meant by that? Your Honor, I'm not entirely sure what the Court meant by that, but I think one thing is... I thought it was pretty clear, so maybe I missed this. What do you want us to do with that phrase? Well, in the first instance, I think that what Pula stands for is the proposition that the conduct of all persons who may have caused the injury may be considered on the issue of causation, and that's unambiguously set out, and that is not limited to the issue of intervening, superseding, causation. The jury found the State of Montana was not a cause. It didn't reach the question of intervening, superseding, causation. I assume that's true. They go on to say, but this does not have anything to do with apportioning damages in that same case. True, Your Honor, but it does establish that a jury may consider when you have two or more actors, and in a case like this, you have an actor, Mr. Fagnani, whose conduct is indispensable to the very existence of the cause of action, that you may consider all of that conduct in determining whether or not a critical element of the cause of action has been satisfied, and that's the element of causation. Do you think we should send this to the Montana Supreme Court to resolve the issue? Frankly, Your Honor, I don't think it's necessary. I think that in this case, given that we have a substantial factor test... I see. So your answer is, if I'm going to win, I'll decide the case anyway, but if I'm going to lose, send it to Montana first. Is that your position? No, Your Honor. If you're going to lose, we should decide. Well, Your Honor, I think it is up to this Court... It's a significant question of state law. It is, and I'm simply suggesting to the Court that given the law of the state of Montana, and specifically with reference to the Pula decision, that there's no need to send the matter to the Montana Supreme Court. If the Court, in its wisdom, decides that the Montana Supreme Court should look at the issue, we're certainly prepared to deal with the issue at the Montana Supreme Court. Montana doesn't have a certification procedure. That's my understanding, Your Honor. It does. It does. It takes a long time. Let me ask another question about 703 on which you depend. 703-4 says specifically, second sentence, for purposes of determining the percentage of liability attributable to each party whose action contributed to the injury complained of, the trier of facts shall consider the negligence of the claimant, injured person, defendants, and third party defendants. It does not say intentional act. But you wish us to imply that that's what it says? Your Honor, what I'm suggesting is that the statute has to be considered in light of general principles of court law. And that's what the Pula decision stands for. And whether or not the plaintiff has satisfied the burden in any court case of establishing causation. And the Court did hold in that case. On the basis of a jury verdict, did not even reach the question of intervening in superseding causation, but simply said the state of Montana's negligence, they did find the state negligence was not a cause of the injury, and allowed the jury to consider the conduct of a rapist. That the issue on the question of causation regarding the conduct of intentional conduct can be considered. Furthermore, in this case, there is an additional question of whether or not the conduct of Mr. Fagnani is intentional or negligent anyway. That issue was submitted to the jury carefully by the district court on the question of causation. And the jury found two cons. Thank you. Thank you. In rebuttal, I think it would be improper for this court to read in any language into 703. I think that flies in the face of any type of principle of statutory construction. And I think that this court has the benefit. I mean, because we have these unusual statutes that says, well, this one's the law until you hold it unconstitutional. Then this one applies. But when you look at 705, the Montana legislature did know the difference between a comparative fault and a comparative negligence scheme. And Montana clearly falls on the side that we have a comparative negligence scheme. PULA has nothing to do with anything other than it's a standard intervening cause instruction. And if you look at the verdict form that the judge submitted, it is a bit of a vexing question, though, isn't it? Pardon me? It is a bit of a vexing question. I didn't, you know, I neglected to point out to you what was about the language of the statute that I found troubling. I had trouble finding the exact language. But I was looking at 703.1, the first sentence. Right. That seems to, in the first phrase, you know, when I asked you the first question, I said the language of the statute seems to support the district court, and that is the first part of the sentence talks about negligence, but then when it talks about apportionment, it talks about anybody who might be liable. And to me, at least in its plausible readings, it's in the negligence of party and national initiatives. So if you're dealing with a situation where a party is charged with negligence, each party against whom recovery may be allowed, okay, and this doesn't necessarily mean, as we know from 701 and from this common law, you don't, not merely negligent people, but also intentional tort defeasors. So at least the statute, to me, seems to create an ambiguity, and I would even say it's the more plausible reading. And that doesn't, what do you do with that? Well, I don't think that it's, what I do with it is I don't think if you read 702 and 703 together, it's clearly it only applies to negligence. Then, Your Honor, if you look at 705, that answers the question. Okay. If you look at 705. I don't have, yeah, I do have 705. Yeah. What does 705 say? 705 talks about comparison of fault. Okay. Give me a language, a subsection. Give me something. It's in the first sentence. 705, I don't have it in front of me, Your Honor, but I know what it says. It says that justification described in 102 and 104, which is something else, I don't know what it is, is not available to a person who is doing certain things. That has to do with a different thing. 705 does away with joint and several liability. It applies several liability only, and it speaks in terms of. Oh, I'm sorry, I was reading 105. Yeah. So I don't know what 705 says. Excuse me, 105 is the statute. It is the statute. Yeah. I'm sorry, how does that help? Well, that statute only applies if 703 were to be held unconstitutional, and it is the statute that indicates to me, and I pointed out in my brief, that the legislature in Montana knew the difference between a comparative negligence scheme and a comparative fault scheme. And if 703 were to be held unconstitutional, we would end up with a comparative fault scheme. And to me, that's the clearest language of the clearest indication of legislative intent that the legislature intended 703 to apply to negligence only. And the answer, Judge, to your question, as I go back to the Martel case, that says that we hold, therefore, that all forms of conduct amounting to negligence in any form, including but limited, et cetera, et cetera, are to be compared with any conduct that falls short of conduct intended to cause injury or damage. Now, to me, Martel is the controlling case, and Martel stands for the proposition that in these kind of cases, we're not supposed to compare intentional conduct to negligent conduct when we apportion liability. I mean, Martel talks about Montana being a comparative negligence. Right, and we adopted our statute. Then there's these legislative changes. Does that change anything? No, the legislative changes, maybe I'm not explaining it very well because it is kind of unusual, but we have an alternative statute to 702, and we have an alternative statute to 703. In the event those statutes were held unconstitutional by the Montana Supreme Court, then the legislature provided that the second 702 and 705 will come into effect. They don't like what the Montana Supreme Court does. I mean, they want to have the last word in Montana, the legislature does. So they're saying you have a comparative negligence scheme, but if you tinker with it, we're going to give you something worse. That's what they're saying. We're going to give you, from the plaintiff's point of view, we're going to give you a comparative fault scheme. And so to me, that's the clearest indication that the legislature recognizes we have a comparative negligence scheme because they know what a comparative fault scheme is and they could have enacted it, and Martel is the controlling authority. And on question number nine on the verdict form that the judge submitted, the difference that I'm trying to make, the question was, was the intentional conduct of Gilbert Fagnani an unforeseeable and intervening superseding cause of federal injuries? The jury answers, no. Then that is the end of the consideration of Mr. Fagnani's conduct in this case. It is proper to ask that question in any kind of case like this, but then you don't get to a portion of liability. I say that you don't recommend sending the case to Montana. I have no objection to sending it to Montana because I know what they'll do. I'm confident in what they say. And apart from sending it to Montana Supreme Court, you want us to reverse the use of intentional and comparative negligence at all? That's correct. It has to be reversed because it's an inconsistent verdict because of the 10 percent that just simply went out the window. Reverse because the verdict form was improper because it allowed the jury to compare Fagnani's intentional conduct with the negligent conduct of Greyhound in violation of the statutes of the state of Montana. Okay. Okay. Thank you. Thank you very much. Counsel, the case is now able to be submitted. What is your argument in the Sierra Club v. Minerva County case? We'd like to keep counsel guessing.
judges: D Nelson, Kozinski, McKeown